[No. E047002. Fourth Dist., Div. Two. Sept. 17, 2009.]

BRYAN COOPER, Plaintiff and Appellant, v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
Defendant and Respondent.

**COUNSEL**

McCuneWright, Richard D. McCune and Kristy M. Arevalo for Plaintiff and Appellant.

Berger Kahn, Sherman M. Spitz, David B. Ezra and Jeffrey S. Crowe for Defendant and Respondent.

**OPINION**

**KING, J.—**

## I. INTRODUCTION

The present appeal is from a judgment entered after the trial court's grant of defendant State Farm Mutual Automobile Insurance Company's (State Farm) motion for nonsuit, following plaintiff's opening statement.

Plaintiff and appellant Bryan Cooper was an insured of State Farm. He was involved in a single-car accident allegedly caused by a tread separation of the right rear tire. As part of the collision damage settlement with plaintiff, State Farm acquired possession of the vehicle, including the right rear tire. State Farm had the tire examined by an expert, who opined that it was defectively manufactured. State Farm notified plaintiff of its expert's opinion. Plaintiff sued the tire manufacturer, Continental Tire North America, Inc. (Continental Tire).

After plaintiff's counsel notified State Farm of the importance of the tire to plaintiff's case against Continental Tire, and after State Farm informed plaintiff that it would retain the tire, State Farm disposed of the car and the allegedly defective tire. Plaintiff then sued State Farm for damages allegedly caused by State Farm's destruction of the tire.[1] Plaintiff contends that as a result of State Farm's conduct, he was unable to prove his product defect case against Continental Tire. The parties waived jury trial and plaintiff's counsel made his opening statement. The court thereafter granted State Farm's motion for nonsuit.

The issue in the motion for nonsuit was whether plaintiff may legally recover damages against State Farm for injuries sustained in the underlying automobile accident, or whether said recovery is, by its very nature, too speculative. Relying primarily on *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1 [74 Cal.Rptr.2d 248, 954 P.2d 511] (*Cedars-Sinai*) and *Temple Community Hospital v. Superior Court* (1999) 20 Cal.4th 464 [84 Cal.Rptr.2d 852, 976 P.2d 223] (*Temple*), the trial court ruled that plaintiff was legally precluded from recovering damages for the alleged destruction of the tire because he would be unable to show that he would have prevailed in his case against Continental Tire had the tire not been destroyed.[2] We disagree with the trial court's analysis and conclusion as applied to a motion for nonsuit following opening statement and therefore reverse the judgment.

■ Initially, *Cedars-Sinai* and *Temple* are not on all fours to the present case because here, plaintiff set forth a prima facie case that he relied to his detriment on State Farm's promise to preserve the tire; no such promise and reliance were present in *Cedars-Sinai* and *Temple*. Second, we conclude that plaintiff's opening statement referred to sufficient prima facie evidence to create a strong inference that the tire was defective and, had it not been destroyed, plaintiff would have been able to prove his case against Continental Tire. We also conclude that, under the present facts, plaintiff's damages are

---

[1] Plaintiff's initial complaint was filed against Continental AG, Continental Tire, and J & S Auto Repair. By way of a first amended complaint, two additional causes of action were alleged against State Farm relative to the destruction of the tire. Plaintiff dismissed Continental AG and J & S Auto Repair from the action. Following mediation, plaintiff settled his case against Continental Tire, leaving State Farm as the only remaining defendant.

[2] Following a discussion between the court and counsel, the trial court indicated that, from a legal point of view, it had significant problems with the damages being sought. As it stated: "[T]he nature of the damages being sought here are the exact same things that would be sought if we still had a spoliation cause of action in California. And is the jury going to be placed, as indicated in *Cedars-Sinai* and our *Farmers [Ins. Exchange v. Superior Court* (2000) 79 Cal.App.4th 1400 [95 Cal.Rptr.2d 51]] case, in a position of having to speculate as to what effect—what causal effect the piece of lost evidence may or may not have, what weight it would have, what—how would that other case have turned out. There is a host of issues that the Court—I would find almost to be insurmountable . . . ."

reasonably ascertainable. Lastly, we believe plaintiff's pleadings, in conjunction with his opening statement, encompass the legal concepts of promissory estoppel and/or a voluntary undertaking by State Farm.

## II. STATEMENT OF FACTS

### A. *The Pleadings*

By way of plaintiff's first amended complaint, plaintiff added State Farm as a defendant to his pending action against Continental Tire. As against Continental Tire, plaintiff alleged that the right rear tire on his vehicle was manufactured by Continental Tire, that the tire was defective and caused his vehicle to go out of control and roll over, and that he was injured as a result. State Farm was sued in the fifth and sixth causes of action for "Breach of Implied Covenant of Good Faith and Fair Dealing" and "Negligent Destruction of Evidence." The allegations underlying both causes of action were that plaintiff sought custody of the tires on the vehicle and that State Farm, upon demand, "refused to release said tires to plaintiff, stating that it would retain custody of the tires in order to pursue subrogation claims against third parties." Plaintiff further alleged that State Farm "entered into a special relationship with its insured to preserve the [Continental] tires" and it "violated its contractual and fiduciary obligations to plaintiff by losing, destroying, disposing of and/or failing to preserve the [Continental] tires." And, as stated in plaintiff's sixth cause of action, "[p]laintiff reasonably relied to his detriment upon [State Farm's] voluntary undertaking to preserve the [Continental] tires."

### B. *Plaintiff's Opening Statement*

Plaintiff's counsel's opening statement was as follows:

"On August 29, 2002, [plaintiff] was the driver of a 1999 Ford Ranger that was involved in a single vehicle accident. At the time of the accident, he was insured by State Farm under his father's policy . . . . [¶] . . . [¶]

". . . The accident was on [Interstate] 10 westbound in Redlands. [Plaintiff] was wearing his seat belt. He was traveling 65 to 70 miles per hour when his right rear tire suddenly failed. It caused a loss of control. . . .

"Following the accident . . . [a] claim for property damage was made. The vehicle was totaled and [plaintiff] was provided by State Farm a check for the full value of the vehicle.

"One of the provisions of Exhibit 1 is on Exhibit 1-20 of the policy, which is under Settlement of Loss. The policy states: We have the right to settle a loss with you or the owner of the property in one of the following ways—and the important one is No. 1—pay the agreed-upon actual cash value of the property at the time of the loss—and what's important here—'in exchange for the damaged property.'

"So in order for [plaintiff] to obtain the benefit of his bargain with the insurance company and obtain the cash value, he was required to turn over the property to State Farm. State Farm took the property. [¶] . . . [¶]

". . . State Farm had the tire examined on hearing that [plaintiff] said the cause of the loss of his control was the failure of the right rear tire. And State Farm's own experts determined, based on that review, both an estimator as well as a specific tire expert that State Farm hired, that this tire was, in all probability, defectively manufactured and that was the cause of the accident.

"[Plaintiff] hired a lawyer to pursue his case against Continental Tire, the manufacturer of the tire that failed. The name of the law firm was Welebir and McCune. Welebir and McCune wrote to State Farm and requested, slash, demanded, that they keep possession of the tire so that [plaintiff] could pursue his case.

"State Farm made, on . . . three different occasions . . . , an explicit promise that they would preserve that evidence. They broke that promise, and in April 2003, despite having three times made promises that they would keep the tire, they, in fact, sold the vehicle with the tire in it and destroyed the tire, thereby destroying [plaintiff]'s case against Continental Tire.

"The result of their destroying the tire was that [plaintiff] had no reasonable chance of prevailing in a product liability case against Continental Tire. The basis for that is a case that's name is *Stephen v. Ford* [*Motor Co.* (2005) 134 Cal.App.4th 1363 [37 Cal.Rptr.3d 9]], which is a California case, in which it was a Ford-Firestone failure, and plaintiff did not have the tire to pursue that case. . . . [T]he court . . . excluded plaintiff's expert on the basis that it was not reliable testimony to provide testimony as to a defective tire on photographs alone.

"So, with that, [plaintiff] lost his ability to collect for his serious personal injuries, that included over $40,000 worth of medical expenses, and severe pain and suffering and general damages.

"We believe that the explicit promise, and then the broken promise, supports a cause of action for breach of contract. I'd like to go through the elements of the formation of the contract.

"I think the first important aspect is that there was a special relationship between the parties. The courts have found . . . a special relationship that is more than just independent parties. And because of that special relationship, State Farm was given the advantage—or the position of being able to keep [plaintiff]'s property when otherwise they would not have had any right to keep it.

"And part of that special relationship requires State Farm to put its interest no higher than [plaintiff]'s interest. State Farm had a subrogation claim of $15,000. [Plaintiff] had a potential claim against Continental Tire of hundreds of thousands of dollars. Despite that, State Farm decided that it would keep the tire for its $15,000 case, and in doing so, it put its interest above the interests of [plaintiff].

". . . The evidence that will support the specific promise, Exhibit 6, would be plaintiff's first evidence to support a specific promise. And that is a letter from State Farm, dated October 9, 2000, written to Mr. Wright, the lawyer handling the case for the law firm of Welebir and McCune, attorneys for [plaintiff], in which Marcia Shinaul, the State Farm representative, specifically told plaintiff that they would preserve the evidence.

". . . [I]n a telephone conversation between a Barbara Nitz—who replaced Marcia Shinaul as the adjustor on the case—and Mr. Wright . . . there was a discussion as to plaintiff wanting the tire and the vehicle . . . wanting the tire itself in order to preserve the evidence.

"Ms. Nitz indicated that no, that State Farm was going to keep that tire . . . but that it would preserve the tire.

"Then on Exhibit 7, which is a letter dated November 27, 2002, Ms. Nitz wrote to Mr. Wright and confirmed that conversation, in which she specifically said, we will continue to hold the vehicle for 30 days from our conversation, at which time we will retain the tire and dispose of the salvage.

"Ms. Nitz, on behalf of State Farm, for the third time now, promised plaintiff that the tire would be retained. In the conversation—that is the specific promise leading to the formation of the contract.

"That promise, whether it's considered a unilateral promise or an offer, either one, was accepted by Mr. Wright in the telephone conversation on November 26, 2002.

"Mr. Wright . . . would testify that he accepted the offer. The consideration for that formation of contract is that if State Farm had said, We will not keep the tire, or if State Farm had been silent on keeping the tire, [plaintiff]'s lawyer would have been required to file an action and have the Court award possession of the tire either to the court or an order to hold the tire or . . . an order providing it to plaintiff. Plaintiff's foregoing that motion is consideration for the contract.

"The second element after formation of the contract is whether plaintiff did all that was required under this contract. And to make sure that I am clear, the contract was State Farm's promise to retain the tire for the benefit of both itself and [plaintiff].

"Plaintiff did all that was required under that contract. There won't be any testimony from any of the parties that plaintiff did not do all that was necessary to fulfill its part under that contract. All the conditions that were precedent required to make State Farm responsible to do that had been met.

"The fourth element is State Farm failed to do something required by the contract. And what they did in this case, as will be testified to by Barbara Nitz, is they sold and destroyed the evidence that they promised they would keep.

"Whether that was intentional or unintentional, it doesn't matter. Ms. Nitz will testify that that was done . . . contrary to what was told and relied upon by the plaintiff.

"Then we get to the issue that has been difficult for all the parties and the Court, which was the harm as a result. That's the next element of the contract.

"Whether there is harm—first the harm has to be foreseeable, and it has to be foreseeable to State Farm. And this clearly—the harm of [plaintiff] losing his ability to pursue the case against Continental Tire was clearly foreseeable.

"Exhibit 8 is a letter written December 24, 2002, from Mr. Wright, again to Barbara Nitz of State Farm, in which [plaintiff] advised State Farm: [']Please be advised that if you dispose of the vehicle at this time and your insured's ability to recover for his damages is impaired in any way, State Farm . . . will be held liable for intentional spoliation of evidence and bad faith.[']

". . . [T]he testimony from Ms. Nitz will be she understood that if evidence was destroyed that she was obligated to keep, that the harm that would result from that was an action against State Farm, and the damages for that would be loss of [plaintiff]'s ability to pursue the case.

"Exhibit 5 is further support for the foreseeability of harm, which was the opening letter that was sent by Welebir and McCune to Marcia Shinaul, at that time with State Farm, which was dated October 1, 2002. And in that letter, in capital and bold letters . . . [¶] . . . [¶] it says: [']It is absolutely essential that the insured's vehicle be maintained, slash, preserved, in its immediate post-accident condition, including all four tires, until our investigation is completed. The rights of our clients, slash, your insureds, are tied to the preservation of this evidence. Inasmuch as you physically control the vehicle and its component parts, this request creates a duty for you to preserve the evidence pursuant to this request.[']

"I don't think that State Farm could have any confusion that the harm that would be suffered by [plaintiff], if it did not follow through on its promise, was the loss of the vehicle and the loss of [plaintiff]'s case.

"The next provision that the Court has already spent much time talking about is that the harm must be ascertainable. The first element of that is plaintiff must show that it is more likely than not that [plaintiff] would have prevailed against Continental Tire if the tire had not been destroyed.

"And the evidence that plaintiff would have to support that starts with Exhibit . . . 2-11, which is part of the claims file for State Farm. And this would be testified to by Marcia Shinaul, in which their estimator, who is their vehicle expert, noted in the file: [']I inspected our insured's right rear tire and found that the tread appeared to have separated from the tire carcass before the accident occurred. The right rear wheel well damages revealed the tire tread pushed the right rear area of the wheel well lip towards where the tire separated from the tire carcass.[']

"Goes on to talk about what he saw. Then the last sentence says: [']This indicates the tire tread spun around, flapping against the bed side as it was separating. In my opinion, the tire tread separated, causing our insured to lose control of the vehicle.[']

"Following that, State Farm hired a specific tire expert named Bill Hagerty to inspect and photograph the tire. Mr. Hagerty is prepared to come in and testify as to his findings. He is not employed by State Farm. He has his separate company.

"Mr. Hagerty, on Exhibit 2-9, told State Farm . . . he looked at the tire of the insured vehicle and he feels we have a . . . good claim for [subrogation] against the tire manufacturer. Although there have not been any recalling of these tires, . . . he feels we have a good case. Bill indicates he will do a report and send it to me.

"He also indicates he took—he put the tire back into the bed of the truck.

"In response to this, on Exhibit 4, State Farm wrote a letter to [plaintiff's] father, saying that the tire was the cause of the accident. They did not find this a chargeable event against [plaintiff], which means that State Farm's determination was that the tire was 100 percent the cause of the accident.

"State Farm also, on Exhibit 9, wrote a letter to Continental Tire . . . saying: [']We are writing in regard to the damage to our insured's vehicle. Our investigation indicates the damage was caused by tire failure. As a result, our insured's vehicle was determined to be a total loss. The information in our file indicates you, Continental Tire, are responsible for this damage.[']

"Then Exhibit 3-1 is the report from Impact General and Mr. Hagerty. And under Conclusions from this tire expert, he states: [']The tire tread detached from the carcass due to a manufacturing defect. To manufacture a tire that separates is below the standard for the tire manufacturing industry.[']

"I don't think there is much doubt that plaintiff will be able to raise a factual issue that . . . [plaintiff] would have . . . more likely than not been able to prevail against . . . Continental Tire if the tire had not been destroyed.

"And the reason, as I mentioned a little bit earlier, why he could not effectively pursue Continental Tire, was the Court's finding in *Stephen v. Ford* [*Motor Co.*], *supra*, [134 Cal.App.4th 1363], which found that a tire expert testifying as to a defect based on photographs should be excluded from the case.

"So plaintiff believes that the harm is ascertainable.

"Then the second question is, are the amount of damages ascertainable. And the amount of damages . . . [plaintiff] would have been able to recover from Continental Tire after proving that it would have, in all probability, prevailed. And there are two elements of that.

"First is economic. Well, we have a stipulation in this case as to the special damages. And that is Exhibit 10 to the exhibits that were provided to the Court. And both parties stipulated that the medical expenses of $40,980.93 are reasonable and necessary medical expenses from the accident. So there .can be no significant issue that it would be difficult or impossible to ascertain the special damages.

"[Plaintiff] was a student. There is not any loss of earnings. So there is not special damages related to that. So the special damages are clearly ascertainable.

"The non-economic damages—there is not a stipulation as to value, but they are very capable of being decided by the jury. If allowed to proceed, Dr. Catalano, [plaintiff]'s treating physician at Loma Linda, would testify as to his injuries and their relationship to the accident. And [plaintiff] himself would testify as to his injuries and the result of those injuries.

"This jury would be provided the information that would allow them to make a determination as to what the general damages were, and put together with the economic damages, be able to provide ascertainable damages for the either intentional or unintentional destruction of the tire."

C. *Exhibits Offered by Plaintiff*

During opening statement, plaintiff's counsel referenced exhibits 1 through 10, which were part of plaintiff's case-in-chief.

Exhibit 1 is a copy of plaintiff's automobile policy. It provides that State Farm agrees to pay to its insured "the agreed upon actual cash value of the property at the time of the *loss* in exchange for the damaged property."

Exhibit 2 consists of notations in the State Farm claims file and exhibits 4 through 9 are correspondence between plaintiff's counsel and State Farm. Chronologically, the substance of the entries and letters appear as follows:

"09-06-02 . . . [¶] . . . [¶] . . . [Named insured] thinks there is a defect with the tires/Gen'l Tires. . . ."

"09-12-02 . . . [¶] I called the insured . . . [H]e has another tire in his garage, the same type tire that is split down the middle. I told him that I was having our estimator inspect the tires. . . ."

"09-12-02 . . . [¶] . . . THE ESTIMATOR CALLED AND INDICATED HE LOOKED AT THE INSURED'S TIRES AND THEY DID SEPARATE[.] BASED ON THIS, I WILL ENTER A DID OF X BECAUSE IT IS NOT THE FAULT OF THE INSURED. THERE IS NO RE-CALL ON THESE TIRES."

"09-12-02 . . . [¶] I called the insured and told him of my conversation with the estimator . . . ."

"09-13-02 . . . [Estimator] . . . [¶] I inspected our insured's right rear tire and found the tread appeared to have separated from the tire carcass before the accident occurred. The right rear wheel well damages revealed the tire tread pushed the right rear area of the wheel well lip upwards when the tread separated from the tire carcass. There is also evidence on the entire right bed side of tire residue. This indicates the tire tread spun around, flapping against the bed side as it was separating[.] In my opinion the tire tread separated causing our insured to lose control of the vehicle."

09-24-02: Letter from State Farm to its named insured, the named insured is informed that based on an inspection "the tire appeared to have separated from the tread before the accident occurred."

"10-01-02 . . . [¶] . . . I received a call from the Law offices of Welebir and McCune . . . . They represent the insured for the loss, they are going to make a claim against the tire company. . . . I told her that I will call Co-Part to find out what it will cost for them to keep the vehicle there and I will get back to her. . . . I called co-part and asked them to wrap this vehicle. I then call Impact Gen to inspect the insured vehicle."

"10-01-02 . . . [¶] . . . [¶] . . . DO NOT MAIL THE TITLE ON THIS VEHICLE TO CO-PART UNTIL I HAVE DIRECTED YOU TO. THIS VEHICLE IS NOW ON HOLD."

10-01-02: Letter from plaintiff's counsel to State Farm in which counsel indicated that they are investigating a products liability case. As stated: "**IT IS ABSOLUTELY ESSENTIAL THAT THE INSURED VEHICLE BE MAINTAINED/PRESERVED IN ITS IMMEDIATE POST ACCIDENT CONDITION, INCLUDING ALL FOUR TIRES**, until our investigation is completed. The rights of our clients/your insureds are tied to this preservation of evidence. Inasmuch as you physically control the vehicle and its component parts, this request creates a duty for you to preserve the evidence

pursuant to this request. [¶] If you do not have the facilities to properly secure and preserve this evidence please let us know and we will be happy to make arrangements to transfer it to our locked warehouse facility. [¶] Please be advised that any destruction, alteration, salvage, . . . may be/can be/will be considered actionable spoliation of evidence."

"10-03-02 . . . [¶] . . . Bill Haggerty of Impact Collision called, he indicates he looked at the tire on the insured vehicle and he feels we have a good claim for sub against the tire manufacturer. Although there have not been any recalls on these tires he indicates he feels we have a good case . . . ."

"10-08-02 . . . [¶] . . . Letter sent to Welebir and McCune advising them that we have preserved the insured vehicle and for them to call me when they want their expert to see this vehicle."

10-09-02: Letter from State Farm to plaintiff's counsel which states, in part: "Please be advised State Farm has had your client's vehicle specially wrapped to preserve the evidence. [¶] Please contact my office upon your receipt of this letter so that you can have your investigator go in to inspect this vehicle."

"10-16-02 . . . [¶] . . . [¶] . . . DO NOT MAIL TITLE TO COPART UNTIL MA'S INSTRUCTS AS VEH ON HOLD[.]"

"10-18-02 . . . [¶] . . . Report received from Impact General . . . ."

"11-15-02 . . . [¶] . . . I called Atty Welebir's office to advise them that we will no longer store this vehicle. I also got a pro-quote of 1104.74 which is what the attys office needs to pay us so they can take possession of this vehicle. I have sent them a letter advising them they need to contact us in the next 15 days."

"11-25-02 . . . [¶] C/R Nitz and I discussed this claim. We need to talk with our subrogation department based on Impact Generals report. We need to see if they need us to keep the vehicle. If not, okay to grant our insured thirty days to make arrangements to owner retained the salvage on this vehicle. They will need to pay us the salvage amount. If subrogation thinks we have a case, refer the file to subrogation and set up a dummy file to process the salvage."

"11-25-02 . . . [¶] . . . I called subrogation and was told we only need to retain the tire to pursue subrogation against the tire maker."

"11-27-02 . . . [¶] . . . I spoke to David Wright [plaintiff's counsel] yesterday regarding the ins. veh. I expl. we will hold the vehicle for 30 days at which time we will dispose of salvage and retain the tire for subrogation . . . . Called Copart . . . ."

11-27-02: Letter from State Farm to plaintiff's counsel in which State Farm acknowledges receipt of a November 22 letter from plaintiff's counsel. Further, the letter states: "I believe you stated you were interested in the tire as you needed to contact the manufacturer regarding this loss. We also, need the tire for our subrogation on damages we have paid. We will continue to hold the vehicle for 30 days from our conversation, at which time we will retain the tire and dispose of the salvage."

12-24-02: Letter from plaintiff's counsel to State Farm in which counsel stated: "You have stated that you intend to preserve the tires, but that you will dispose of the vehicle on December 26, 2002. . . . [¶] Please be advised that if you dispose of the vehicle at this time and your insured's ability to recover for his damages is impaired in any way, State Farm Insurance will be held liable for intentional spoliation of evidence and bad faith."

"12-27-02 . . . [¶] We'll put this vehicle on hold until the inspection can be made by Continental Tire. We will also put the attorney for our insured on notice of the additional storage charges that they will be responsible for."

"01-16-03 . . . [¶] . . . He states to forward the notice of sub to tire co. Tell them we will hold the veh. but will not be responsible for expenses relating to their inspection. We would look to them for reimb. Called Carolyn again at Continental Tire. Expl. we have the veh. and the tire and would hold but would not be responsible for expense to keep veh. She states they don't need the whole veh. but would need photos of the veh. and may request the tire be shipped to them. She will contact the attorney to see how they will auth. the handling of this matter."

"01-17-03 . . . [¶] . . . Carolyn Miller called from Continental Tire. . . . She will have the inspector call SF when he plans on going to copart . . . he is not to take anything from the veh."

01-17-03: Letter from State Farm to Continental Tire in which State Farm states that its investigation shows that tire failure caused the accident, and asks Continental to turn State Farm's claim over to Continental's insurance company.

"01-20-03 . . . [¶] . . . The Tire Co. is to inspect Mon. 1/20. Once the inspection is done, we will dispose of salvage. The Tire Co. has been put on notice of subrogation."

"02-27-03 . . . [¶] . . . The veh. was inspected . . . . It appears, ok to release for sub."

"02-27-03 . . . [¶] . . . [P]lease contact copart and release vehicle from safeguard. . . ."

"04-25-03 . . . [¶] Claim closed. Subrogation not pursued."

"08-22-03 . . . [¶] . . . PC to CoPart . . . I asked her if they kept tire under safeguard? Mary Lou said, No, veh shold [*sic*] 4-17-03. . . ."

"08-26-03 . . . [¶] Attny Wright called back: Told him I'd received his 8/21 fax and that as of today I did not know where the tire was. I did point out that his letter of 12/24/02 asks us to keep the vehicle until Continental had the chance to inspect it which they did in January 03. They had no problem with the vehicle being sold after it was inspected but they expected the tire to be retained and were told so by Barbara in her letter of 11/27/02. They fully expected the tire to be kept even if and when we sold the vehicle . . . . Continental sent a letter on 3/10/03 to attorney Wright asking to get the tire. State Farm was copied on this letter. . . ."

"10-15-03 . . . [¶] Call from [Continental]: They are still waiting for us or insured's attorney to send them the tire for their analysis. Told him we no longer had the tire, it was apparently sold when vehicle was sold as salvage."

## III. ANALYSIS

### A. *Standard of Review*

In ruling on a motion for nonsuit following a plaintiff's opening statement in a nonjury trial, "the trial court is required to 'assume that all relevant evidence' offered by the plaintiff is true, 'and all reasonable inferences or doubts [are] to be resolved in [the] plaintiff's favor. [Citation.] . . .' " (*Lingenfelter v. County of Fresno* (2007) 154 Cal.App.4th 198, 204 [64 Cal.Rptr.3d 378].) In *Galanek v. Wismar* (1999) 68 Cal.App.4th 1417 [81 Cal.Rptr.2d 236], a case which is strikingly similar to the present matter, the court stated: " 'The standard of review for a nonsuit after [the] conclusion of the opening statement is well settled. Both the trial court in its initial decision and the appellate court on review of that decision must accept all facts asserted in the opening statement as true and must indulge every legitimate inference which may be drawn from those facts. [Citations.] A nonsuit at this early stage of the proceedings is disfavored. [Citation.] It can only be upheld on appeal if, after accepting all the asserted facts as true and indulging every legitimate inference in favor of plaintiff, it can be said those facts and

inferences lead inexorably to the conclusion plaintiff cannot establish an essential element of its cause of action . . . . [Citations.]' [Citation.]" (*Id.* at p. 1424.) With this standard in mind, we now turn to the substance.

B. *State Farm Owed a Duty to Plaintiff to Maintain the Allegedly Defective Tire*

Plaintiff's opening statement, in conjunction with the documentary evidence, set forth prima facie facts supporting the existence of a duty owed by State Farm to plaintiff to preserve the allegedly defective tire. Whether based on a contract principle of promissory estoppel or a tort theory of a voluntary assumption of a duty, plaintiff relied to his detriment on State Farm's promise to preserve the tire and/or voluntary assumption of a duty. As a result, State Farm owed a duty to plaintiff. (See, e.g., *Coprich v. Superior Court* (2000) 80 Cal.App.4th 1081, 1091–1092 [95 Cal.Rptr.2d 884] (*Coprich*); *Williams v. State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137].)[3]

*Cedars-Sinai, supra,* 18 Cal.4th 1 and *Temple, supra,* 20 Cal.4th 464, the primary cases relied upon by State Farm, are inapposite. In both cases the issue before the court was whether to *impose in the first instance* a duty on first and third party spoliators to preserve evidence. Here, by contrast, the duty to preserve evidence was independently assumed by State Farm when it made the promise to preserve the tire and plaintiff relied thereon.

In *Cedars-Sinai,* the plaintiff sued the defendant hospital and others for injuries received during birth. During discovery, the plaintiff requested from the hospital various records, including fetal monitor strips. (*Cedars-Sinai, supra,* 18 Cal.4th at pp. 4–5.) The hospital was unable to locate a portion of the medical records requested. The plaintiff thereafter filed a second amended complaint adding a cause of action for intentional spoliation of evidence. (*Id.* at p. 5.)

---

[3] "The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.' [Citation.] [¶] 'Promissory estoppel is "a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced." [Citation.]' " (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 901–902 [28 Cal.Rptr.3d 894].) Not unlike promissory estoppel is a defendant's voluntary undertaking of a duty to a plaintiff. "As a rule, one has no duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act. [Citations.] . . . [T]he volunteer who, having no initial duty to do so, undertakes to come to the aid of another . . . is under a duty to exercise due care in performance and is liable if . . . the harm is suffered because of the other's reliance upon the undertaking. [Citation.]" (*Williams v. State of California, supra,* 34 Cal.3d at p. 23.)

At the beginning of its discussion, the *Cedars-Sinai* court made clear that the question before it was whether to impose a duty in tort to avoid the destruction of evidence by parties to an action. As stated: "In considering whether to create a tort remedy for intentional first party spoliation that is or reasonably should have been discovered before trial of the underlying action, we begin with certain general principles of tort law. 'A tort, whether intentional or negligent, involves a violation of a *legal duty*, imposed by statute, contract or otherwise, owed by the defendant to the person injured.' [Citation.] At issue here is whether to impose on parties to a lawsuit a duty to avoid the intentional destruction of evidence relevant to the lawsuit. As we have stated, the concept of duty ' "is a shorthand statement of a conclusion, rather than an aid to analysis in itself." ' [Citation.] It is ' "only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' [Citation.] Thus, we must examine and weigh the relevant 'considerations of policy' that favor or oppose a tort remedy for intentional first party spoliation." (*Cedars-Sinai, supra*, 18 Cal.4th at p. 8.)

In concluding that no duty existed in first party spoliation cases, the court focused its discussion on weighing the social benefits of recognizing a tort for first party spoliation of evidence against the existing remedies for dealing with such conduct within the confines of the underlying litigation. In particular, the court indicated there were procedural and evidentiary sanctions that could be imposed on the party who destroyed the evidence to redress the fact that the evidence was destroyed. (*Cedars-Sinai, supra*, 18 Cal.4th at p. 12.) In addition, the court referred to the general policy favoring the finality of adjudication and the uncertainty of the fact of harm typically caused by the destruction of the evidence. (*Id.* at pp. 9, 13–14.)

The issue was next addressed by the Supreme Court in *Temple*. There, the court addressed "third party spoliation"—that is, the destruction of evidence by a nonparty to the underlying lawsuit. (*Temple, supra*, 20 Cal.4th at p. 466.) In a four-to-three decision, the court concluded, as it did in *Cedars-Sinai*, that "no tort cause of action will lie."[4] (*Temple, supra*, at p. 466.) In reaching its result, the majority relied upon many of the same factors enunciated in

---

[4] In *Temple*, the plaintiff was injured during an operation when an electrocautery tool allegedly caused oxygen used in the anesthesia to ignite, causing severe burns on the plaintiff's face. She filed a malpractice action against the doctors and a products liability case against the manufacturer, distributor, and others involved in the design and maintenance of the medical equipment. (*Temple, supra*, 20 Cal.4th at pp. 466–467.) At some point following the operation the hospital disposed of the oxygen tank. The trial court in the underlying action thereafter granted summary judgment in favor of one of the defendants involved with the design and/or maintenance of the medical equipment. The basis for granting the motion was that there "was no evidence the electrosurgical device was defective." (*Id.* at p. 467.) Because of this, the plaintiff sued the hospital for spoliation of evidence.

*Cedars-Sinai*, as well as the notion that it would be anomalous to impose a duty in cases dealing with third party spoliation and not first party spoliation. (*Temple, supra*, at pp. 466, 478.) In so holding, however, the court recognized that a duty to preserve evidence may independently exist: "We observe that to the extent a duty to preserve evidence is imposed by statute or regulation upon the third party, the Legislature or the regulatory body that has imposed this duty generally will possess the authority to devise an effective sanction for violations of that duty. To the extent third parties may have a contractual obligation to preserve evidence, contract remedies, including agreed-upon liquidated damages, may be available for breach of the contractual duty." (*Id.* at p. 477.)

■ Here, rather than seeking to impose a general tort duty of care on State Farm to preserve evidence, plaintiff, during his opening statement, presented prima facie facts to support an independent duty to preserve the tire based on State Farm's promise and plaintiff's reliance thereon. As stated in *Coprich*, while there may be no general tort duty to preserve evidence, this "does not preclude the existence of a duty based on contract." (*Coprich, supra*, 80 Cal.App.4th at p. 1091, citing *Temple, supra*, 20 Cal.4th at p. 477.) The general tort duty "policy considerations do not negate the existence of a contractual obligation created by mutual agreement or *promissory estoppel*." (*Coprich, supra*, at p. 1092, italics added.) Additionally, " '[i]t is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to a duty of acting carefully, if he acts at all.' [Citation.] . . . '. . . "[I]f the defendant enters upon an affirmative course of conduct affecting the interests of another, he is regarded as assuming a duty to act, and will thereafter be liable for negligent acts or omissions[.]" ' [Citation.] [¶] Thus, it is settled law that one 'who, having no initial duty to do so, undertakes to come to the aid of another . . .' . . . has 'a duty to exercise due care in performance and is liable if . . . the harm is suffered because of the other's reliance upon the undertaking.' [Citations.]" (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 613 [76 Cal.Rptr.2d 479, 957 P.2d 1313].)[5]

Thus, rather than attempting to impose a duty on State Farm to preserve evidence based upon general tort principles, as was the case in *Cedars-Sinai* and *Temple*, plaintiff asserts that State Farm owed its duty to him based upon its promise to retain the tire and plaintiff's reliance thereon.

In addition to *Cedars-Sinai* and *Temple*, State Farm relies on three additional cases to support the notion that it did not owe a duty to plaintiff to

---

[5] This case is not unlike *Galanek v. Wismar, supra*, 68 Cal.App.4th 1417, where the court found that the plaintiff's former attorney could be liable for spoliation of evidence where there was an already existent duty owed by the attorney to the plaintiff by way of the attorney-client relationship, and that the attorney breached that duty by allowing the spoliation of evidence.

preserve evidence. In *Farmers Ins. Exchange v. Superior Court* (2000) 79 Cal.App.4th 1400 [95 Cal.Rptr.2d 51] *(Farmers)* (Fourth Dist., Div. Two), this court held that an insurance company did not have a duty to maintain an allegedly defective tire. *(Id.* at p. 1404.) Contrary to State Farm's argument, there is no inconsistency between that holding and our present holding. At no time did the defendant in *Farmers* explicitly state to the plaintiff that it would preserve the tire, resulting in reliance by the plaintiff. Indeed, we expressly noted that "[t]hird parties may have a contractual duty to preserve evidence, but [the plaintiff] does not indicate that she is able to amend her pleading to state a breach of contract cause of action." *(Id.* at p. 1407, fn. 5.) Here, based upon the evidence described in plaintiff's opening statement, State Farm promised plaintiff that it would preserve the tire for him and plaintiff detrimentally relied thereon. He has thus set forth sufficient evidence of the breach of contract (promissory estoppel) cause of action that the plaintiff in *Farmers* was unable to state.

In *Forbes v. County of San Bernardino* (2002) 101 Cal.App.4th 48 [123 Cal.Rptr.2d 721] (Fourth Dist., Div. Two), this court held that the defendant county could not be held liable for negligent spoliation of records where a court reporter's transcripts were unavailable for an appeal from the underlying case. This court found that while the court reporter did have a statutory duty to maintain his or her notes, the remedy for the unavailability of the notes was statutorily provided for, by the granting of a new trial pursuant to Code of Civil Procedure section 914. As noted by the court: "Here, the Legislature has provided a remedy for the . . . destruction of court records in the form of Code of Civil Procedure section 914, the remedy granted by this court in the prior appeal." *(Forbes v. County of San Bernardino, supra,* at pp. 57–58.) *Forbes* is easily distinguishable. That case did not involve any promise by the court reporter to the plaintiffs or any statement that the plaintiffs reasonably relied upon to their detriment. Although the court reporter did have a duty to maintain her notes, the duty was created by statute and the Legislature provided a remedy for a violation of that statute. *(Ibid.)* As this court explained: "[T]he fact a public entity has a statutory duty to act or refrain from acting is not enough to create tort liability for a violation of that duty. Rather, the plaintiff also must show the resulting injury would be actionable against a private person." *(Id.* at p. 57.) Because the plaintiffs could not make such a showing, the claim was rejected. Here, by contrast, plaintiff is not relying upon any statutory duty imposed on a public entity, but upon State Farm's express promise to preserve the tire. *Forbes* is inapposite.

Lastly, defendant cites to *Lueter v. State of California* (2002) 94 Cal.App.4th 1285 [115 Cal.Rptr.2d 68], where the appellate court reversed a jury verdict in favor of the plaintiff. *Lueter,* like *Forbes,* is distinguishable. The verdict in *Lueter* was based on the disposal by the California Highway Patrol (CHP) of a piece of tire tread that was found on the roadside following

an accident. (*Lueter v. State of California, supra,* at pp. 1288–1289.) In that case, unlike here, there had been no promise to preserve the tire tread upon which the plaintiff relied. Additionally, there was no independent statutory duty for the CHP to preserve evidence for civil matters. Like the court in *Farmers,* the *Lueter* court expressly noted that it was "concerned solely with the question of a cause of action in tort. The decisional authorities do not foreclose an action in contract where the defendant is under a contractual obligation to preserve evidence." (*Lueter v. State of California, supra,* at p. 1299, fn. 3.)

Because plaintiff set forth prima facie evidence of a promise made by State Farm to preserve the tire and reliance thereon by plaintiff, he adequately established a duty on the part of State Farm.

## C. *Proximate Causation—Uncertainty of the Fact of Harm*

■ Under either a contract or tort theory based on State Farm's promise and plaintiff's reliance, plaintiff must establish that State Farm's breach of its obligation proximately caused him harm. (Civ. Code, §§ 3300, 3333.) Here, the alleged harm suffered by plaintiff was the loss of a meritorious case against Continental Tire. In granting the motion for nonsuit in this case, the trial court concluded that the fact of such harm was too speculative. In so doing, it relied upon *Cedars-Sinai,* which stated: "[T]here will typically be no way of telling what precisely the evidence would have shown and how much it would have weighed in the spoliation victim's favor. Without knowing the content and weight of the spoliated evidence, it would be impossible for the jury to meaningfully assess what role the missing evidence would have played in the determination of the underlying action. The jury could only speculate as to what the nature of the spoliated evidence was and what effect it might have had on the outcome of the underlying litigation." (*Cedars-Sinai, supra,* 18 Cal.4th at p. 14.)

■ While both *Cedars-Sinai* and *Temple* addressed the issue of uncertainty of the fact of harm within the context of whether to impose a general tort duty not to spoliate evidence, the same inquiry is pertinent to the policy considerations of proximate causation. (See *Valdez v. J. D. Diffenbaugh Co.* (1975) 51 Cal.App.3d 494, 509 [124 Cal.Rptr. 467] (Fourth Dist., Div. Two) ["[p]roximate cause . . . is simply a policy determination of whether or not the defendant should be held responsible for his acts"].)

We agree with *Cedars-Sinai* that, in many cases, because the destroyed evidence has not been viewed or examined, it may be impossible for the jury to meaningfully assess what role the missing evidence would have played in the determination of the underlying action. As we explain below, such is not necessarily the case here.

During opening statement, plaintiff's counsel stated: "[T]he evidence that plaintiff would have to support [the certainty of harm] starts with . . . part of the claims file for State Farm. And this would be testified to by Marcia Shinaul, in which their estimator, who is their vehicle expert, noted in the file: [']I inspected our insured's right rear tire and found that the tread appeared to have separated from the tire carcass before the accident occurred. The right rear wheel well damages revealed the tire tread pushed the right rear area of the wheel well lip towards where the tire separated from the tire carcass.['] [¶] Goes on to talk about what he saw. Then the last sentence says: [']This indicates the tire tread spun around, flapping against the bed side as it was separating. In my opinion, the tire tread separated, causing our insured to lose control of the vehicle.['] [¶] Following that, State Farm hired a specific tire expert named Bill Hagerty to inspect and photograph the tire. Mr. Hagerty is prepared to come in and testify as to his findings. He is not employed by State Farm. He has his separate company. [¶] Mr. Hagerty . . . looked at the tire of the insured vehicle and he feels we have a . . . good claim for [subrogation] against the tire manufacturer. Although there have not been any recalling of these tires, . . . he feels we have a good case. Bill indicates he will do a report and send it to me. [¶] He also indicates . . . he put the tire back into the bed of the truck. [¶] . . . [¶] Then . . . [there] is the report from Impact General and Mr. Hagerty. And under Conclusions from this tire expert, he states: [']The tire tread detached from the carcass due to a manufacturing defect. To manufacture a tire that separates is below the standard for the tire manufacturing industry.['] [¶] I don't think there is much doubt that plaintiff will be able to raise a factual issue that . . . [plaintiff] would have . . . more likely than not been able to prevail against . . . Continental Tire if the tire had not been destroyed."

In addition, plaintiff submitted a five-page report by State Farm's tire expert, William O. Hagerty. In this report, Hagerty states: "The tire tread detached from the carcass due to a manufacturing defect. . . . [¶] There are numerous areas of polished or smooth rubber in the separated plies. When polished rubber appears in a separated tire, it indicates that there has been a long-term gradual internal ply separation. . . . This polished rubber indicates that the tire plies had begun separating long before the final catastrophic tread detachment. [¶] There is also evidence of 'shiny brass' in the failed tire tread . . . . [T]he appearance of 'shiny brass' in a failed tire indicates a bonding deficiency during the manufacturing process. [¶] The above indicators show that prior to the final tread detachment, the tire plies had begun to separate internally. When the remaining adhesion between the internal tire plies was finally overcome by the centrifugal force of the rotating tire, the tire tread catastrophically detached from the tire. [¶] . . . [¶] The fact that the tire was still holding air after the tread detachment is a further indication of a manufacturing defect."

Counsel's opening statement and supporting evidence contain prima facie facts strongly suggesting that the tire was defectively manufactured and that the defect caused the single-car accident that injured him—i.e., that he had a meritorious case against Continental Tire. All that remains relative to plaintiff's proof against State Farm is competent evidence to demonstrate that State Farm's failure to preserve the tire probably prevented plaintiff from proving that meritorious case.[6] Plaintiff may or may not be able to establish this fact. Based upon counsel's opening statement, however, plaintiff has set forth sufficient evidence of a defect in the tire such that an expert may be able to base an opinion that if the tire had been available for further examination, he or she would have expected to find additional indicia of a manufacturing defect. Such evidence, together with the already existing evidence, may well be sufficient to prove that plaintiff probably would have prevailed in his case against Continental Tire if the tire had not been destroyed. On the other hand, it is possible that a jury would find that plaintiff already maintained sufficient evidence to prove the elements of his underlying claim against Continental Tire and, therefore, State Farm's failure to preserve the tire did not affect his ability to prove his case.[7] It is also possible that after receiving all of the evidence, the trial court may determine that the evidence establishing the causal link is too speculative and that plaintiff's claim therefore fails as a matter of law.

Suffice it to say, however, that based solely on plaintiff's opening statement, it simply cannot be said as a matter of law that "it would be impossible for the jury to meaningfully assess what role the missing evidence would have played in the determination of the underlying action." (*Cedars-Sinai, supra*, 18 Cal.4th at p. 14.)

Further, the fact that the underlying claim settled against Continental Tire militates in favor of plaintiff being able to demonstrate actual harm. As Justice Kennard explained in her dissent in *Temple*, "the settlement amount is

---

[6] We do not address or decide whether, if plaintiff establishes a prima facie case against State Farm, it would be appropriate to shift the burden of proof to State Farm to establish that the loss of the tire did not prevent plaintiff from proving his case against Continental Tire. (See, e.g., *Galanek v. Wismar, supra*, 68 Cal.App.4th at p. 1426 [discussing policy reasons for shifting the burden of proof to defendant]; see also *Holmes v. Amerex Rent-A-Car* (D.C. 1998) 710 A.2d 846, 850–852 [discussing various burdens of proof relative to claims seeking damages for the destruction of evidence]; *Oliver v. Stimson Lumber Co.* (1999) 1999 MT 328 [297 Mont. 336, 350–351, 993 P.2d 11] [easing plaintiff's burden of proof in spoliation cases].)

[7] In his opening statement, plaintiff relied on *Stephen v. Ford Motor Co., supra*, 134 Cal.App.4th 1363 for the basic proposition that it is impossible for a plaintiff to prove an underlying case of product defect once the product is destroyed. We disagree with plaintiff's interpretation of that case. In *Stephen*, the court merely excluded expert opinion where there had been no expert examination of the tire and the opinions formed were based on "amateur photographs" taken by an adjuster and Polaroid photographs taken by the plaintiff's boyfriend. (*Id.* at p. 1371.)

a reasonable proxy for the litigation value of the underlying action given the absence of the spoliated evidence, and the settlement process is an adequate incentive for the parties to the underlying action to ferret out other evidence in support of their positions." (*Temple, supra*, 20 Cal.4th at pp. 485–486 (dis. opn. of Kennard, J.).)[8] Thus, in this case, the amount of the settlement between plaintiff and Continental Tire is a reasonable proxy for the litigation value of the underlying action in the absence of the tire. If the amount that the jury determines plaintiff would have recovered if the tire had been available is greater than the settlement amount, then actual harm has been demonstrated. If, on the other hand, the amount determined by the jury is less than or equal to the amount received in settlement, then actual harm has not been demonstrated.

Nor do issues concerning the nature and scope of plaintiff's damages preclude plaintiff's claim. Viewing damages strictly within a contractual setting (i.e., promissory estoppel), we conclude that given the present parties to the litigation, plaintiff's damages are the damages he would have been entitled to recover in the underlying personal injury action against Continental Tire, less the amount actually received in settlement from Continental Tire.

■ "In an action for breach of contract, the measure of damages is 'the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom' [citation], provided the damages are 'clearly ascertainable in both their nature and origin' [citation]. . . . [¶] 'Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. [Citations.] This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise.' [Citation.]" (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 550 [87 Cal.Rptr.2d 886, 981 P.2d 978].) However, special damages may be recovered in a contract action when special circumstances cause an unusual injury when "the circumstances were known or should have been known to the breaching party at the time he entered into the contract." (*Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 456 [277 Cal.Rptr. 40].) "The requirement of knowledge or notice as a prerequisite to the recovery of special damages is based on the theory that a party does not and cannot assume limitless responsibility for all consequences of a breach, and that at the time of contracting he must be advised of the facts concerning special

---

[8] This is further supported when, as here, following the settlement between Continental Tire and plaintiff, and after giving notice to State Farm, plaintiff's motion for good faith settlement was granted.

harm which might result therefrom, in order that he may determine whether or not to accept the risk of contracting. [Citation.]" (*Ibid.*) The contract measure of damages applies to claims based upon promissory estoppel. "[D]amages [are] 'measured by the extent of the obligation assumed and not performed.' " And while promissory estoppel is distinct from contract, " '[t]here appears to be no rational basis for distinguishing the two situations in terms of the *damages* that may be recovered . . . .' " (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 692–693 [21 Cal.Rptr.3d 732].)

In evaluating whether the damages for the value of the underlying personal injury action were within the contemplation of and foreseeable by the present parties, we begin by initially noting that State Farm is an automobile liability insurance company. It adjusts first and third party claims on a regular basis. Its adjusters have knowledge as to the value range of liability claims. Evident from State Farm's claims file, as described in counsel's opening statement, is the fact that State Farm knew of the importance of preserving the tire relative to any possible liability claim against Continental Tire. An October 1, 2002, letter from plaintiff's counsel indicates: "Please be advised that any destruction, alteration, salvage, . . . may be/can be/will be considered actionable spoliation of evidence." And in a letter dated December 24, 2002, plaintiff's counsel further informed State Farm: "Please be advised that if you dispose of the vehicle at this time and your insured's ability to recover for his damages is impaired in any way, State Farm Insurance will be held liable for intentional spoliation of evidence and bad faith."

Furthermore, the damages sought by plaintiff are "ascertainable in both their nature and origin." The origin of the damages was defendant's destruction of the tire. The nature of the damages is what plaintiff would have probably recovered in the underlying action had the tire not been destroyed, less the amount received in settlement from Continental Tire. Both aspects of damage were clearly known and understood by the parties at the time State Farm promised to preserve the tire.

It is evident that, based on the written communications between the parties and on State Farm's special knowledge as to the significance of the tire to the underlying litigation, as well as its knowledge of the value range of personal injury actions, State Farm was fully aware of the nature and general amount of damages that it would be exposed to by failing to perform its promise to preserve the tire.

D. *Operative Pleadings*

On appeal, State Farm argues that: "[Plaintiff's] complaint alleged an insurance 'bad faith' claim. It did not assert a cause of action for breach of

contract. [Plaintiff] later abandoned the 'bad faith' claim during trial, changed tactics, and started arguing that State Farm entered into a separate contract to preserve the tire. The facts within [plaintiff's] opening statement/offer of proof demonstrate there was no agreement to preserve the tire. [Plaintiff] relied on the written communication between his tire defect lawyers and State Farm to establish the purported contract." (Fn. omitted.)[9]

By way of plaintiff's first amended complaint, State Farm was added as a defendant to plaintiff's pending action against Continental Tire. State Farm was named in the fifth and sixth causes of action, respectively, for "Breach of Implied Covenant of Good Faith and Fair Dealing" and "Negligent Destruction of Evidence."

The allegations underlying both causes of action were that State Farm, upon demand, "refused to release said tires to plaintiff, stating that it would retain custody of the tires in order to pursue subrogation claims against third parties"; State Farm "entered into a special relationship with its insured to preserve the [Continental] tires" and it "violated its contractual and fiduciary obligations to plaintiff by losing, destroying, disposing of and/or failing to preserve the [Continental] tires." Plaintiff further alleged in the sixth cause of action that "[p]laintiff reasonably relied to his detriment upon [State Farm's] voluntary undertaking to preserve the [Continental] tires." State Farm demurred to both causes of action on the general premise that California law does not recognize a cause of action in tort for negligent destruction of evidence and that the cause of action for breach of the covenant of good faith and fair dealing failed to state sufficient facts to support a cause of action in that it was nothing more than an attempt to circumvent California's preclusion of causes of action for spoliation of evidence. In opposition to the demurrer, plaintiff argued that his cause of action for breach of the covenant of good faith and fair dealing was supported by the alleged facts that State Farm refused to give plaintiff the tire after plaintiff asked for it, and "plaintiff's detrimental reliance on State Farm's representation that it would preserve the tire . . . ." Plaintiff argued that the cause of action was not a recasting of the theory of negligent spoliation of evidence, but was based on an agreement with State Farm that it would keep the tire. The trial court sustained the demurrer without leave to amend as to the sixth cause of action dealing with negligent destruction of evidence; it overruled the demurrer to the fifth cause of action dealing with a breach of the covenant of good faith and fair dealing.

---

[9] At oral argument, counsel conceded that he does not have a "grievance" with the change of theory and that it was very clear that plaintiff's theory was based on the "side agreement" between plaintiff's counsel and State Farm.

Eleven months later, State Farm moved for summary judgment based on "undisputed facts" that it properly adjusted plaintiff's claim for collision coverage and that it engaged in no conduct which deprived plaintiff of, or in any way hampered plaintiff's ability to obtain, the benefits of the insurance agreement. It again argued that the facts alleged in plaintiff's fifth cause of action were not facts dealing with the breach of the implied covenant of good faith and fair dealing, but were nothing more than an attempt to plead spoliation of evidence, which is contrary to California law. In opposition, plaintiff argued that the motion was nothing more than a motion for reconsideration of the court's prior ruling on the demurrer; there was a representation by State Farm that it would preserve the evidence and that plaintiff relied thereon; and that, as such, it is not a recasting of a spoliation of evidence claim, but rather supportive of a theory of breach of the implied covenant of good faith and fair dealing. At the hearing on the motion, discussion occurred as to the correspondence between State Farm and plaintiff's counsel relative to the preservation of the tire. Plaintiff maintained that the representations made by State Farm in the correspondence placed the case within the confines of breach of the implied covenant of good faith and fair dealing. State Farm argued that, to the extent any spoliation claim could be made or that any agreement was entered into, such facts had nothing to do with the underlying insurance contract and by its nature would have to be based on the "separate agreement." In denying the motion, the trial court stated: "I'm persuaded, at least at this stage, that there's a triable issue at least as to whether there was an agreement to preserve. [¶] And . . . it may not necessarily lie in tort. . . . [¶] Breach of the implied covenant generally flows from contract or a contract theory, contractual theory. Whether . . . there was a separate agreement . . . I don't know whether the jury will buy that or not . . . ; but at least for purposes of Summary Judgment I think that there's a triable issue as to whether State Farm had a contractual duty to preserve the tire or offer to sell it to the Plaintiff before salvage."

At the start of trial, and while discussing motions in limine, the trial court asked plaintiff for an offer of proof as to his legal theory of recovery. The court queried as to whether, assuming there was a breach of a contractual relationship between plaintiff and State Farm, plaintiff was attempting to recover damages in tort or in contract. Plaintiff's counsel responded: "I think what the cases that talk about spoliation have said is there is not a separate tort, but they have not wiped out breach of contract as a result of an entity destroying evidence. [¶] So what do we have here? The plaintiff believes that we have a breach of a contract that arises out of a relationship between the insurance company and its insured." Following a brief explanation by counsel of the correspondence between State Farm and plaintiff's counsel relative to preserving the tire, the following colloquy occurred between counsel and the court:

"THE COURT: So what we have—that flushes out something I needed to know. The plaintiff's theory is not premised upon a claim based upon the original insurance policy between the plaintiff and State Farm; but what we are really dealing with here is a—what I will characterize as a side agreement alleged between the plaintiff and State Farm relating to the preservation of an automobile and/or a tire; is that correct?

"[PLAINTIFF'S COUNSEL]: That is correct, your Honor. Although the relationship between the two comes into play on that, but that is correct.

"THE COURT: . . . [¶] In any event, what we have got is plaintiff is pursuing the contractual relationship outside the original scope of the original insurance policy that the plaintiffs had with State Farm regarding the automobile and any liabilities that might flow from that. So we are outside the umbrella, if you will, of the original policy, it seems."

"THE COURT: Okay. And the plaintiff believes that the twist to this case, as I understand it, that separates it from the other types of spoliation cases, which are not allowed in California by our California Supreme Court, is that there was not a duty imposed—that a duty wasn't created in the sense that—well, let me back up. [¶] I think the plaintiff is contending that there was a special relationship created by this side agreement to preserve the evidence with . . . State Farm, that is unique in the sense that that would give it a foothold to assert the claims being sought here as opposed to a situation where there was no contractual duty. [¶] Is that correct?

"[PLAINTIFF'S COUNSEL]: With the addition of the specific representation, yes, your Honor."

Upon inquiry from the court, State Farms's counsel stated:

"First—I'd like to start at the end. . . . No matter how we ultimately cut this, whether we have a breach of a contract theory, a breach of the implied covenant of good faith or fair dealing theory, and whether that theory is based on a breach of the implied covenant of terms that are within the insurance contract or a breach of the implied covenant of terms that are in some sort of side agreement or contract, ultimately all of it is going to funnel down to this problem—insurmountable problem that the plaintiff has in establishing cognizable legal damages in this case, damages that are recoverable under law. [¶] . . . [¶]

"If we are dealing with a contract theory—contract-based theory, then we are now relegated to the measure of damages specified in Civil Code [section] 3301. I don't think I'm—this may be very close to actually the way the

section reads . . . . [¶] And basically what that section holds is: No damages may be recovered for breach of contract that are not clearly ascertainable in both their nature and origin. 'Clearly ascertainable in both their nature and origin' is language I seem to recall from that."

 " 'The rule in this state with respect to the construction of a pleading, for the purpose of determining its effect, is that its allegations must be liberally construed, with a view to substantial justice between the parties. [Citation.] It is not to be assumed from that rule of construction, however, that by construction there may be inserted in a pleading vital pretermitted averments, or averments which are neither directly set forth therein nor reasonably within the fair import of the language of those which are set forth. But if the averments themselves may, without a strained construction, or without doing violence to language, be held clearly to imply or state a fact essential to the statement of a cause of action or to the support of the theory upon which reliance must be had to make out a case or a defense, then the rule of the code should be invoked and the pleading construed with a view to the promotion of substantial justice between the parties to the action.' " (*Estrin v. Superior Court* (1939) 14 Cal.2d 670, 677 [96 P.2d 340]; see Code Civ. Proc., § 475 ["The court must, in every stage of an action, disregard any error, . . . or defect, in the pleadings . . . which, in the opinion of said court, does not affect the substantial rights of the parties."].) And, as stated in *Potrero Homes v. Western Orbis Co.* (1972) 28 Cal.App.3d 450, 456 [104 Cal.Rptr. 633]: "A party is entitled to any and all relief which may be appropriate under the scope of his pleadings and within the facts alleged and proved, irrespective of the theory upon which the facts were pleaded, [or] the title of the pleading . . . ."

Here, the alleged fact underlying both causes of action was that State Farm, upon demand, "refused to release said tires to plaintiff, stating that it would retain custody of the tires in order to pursue subrogation claims against third parties." Further alleged is that State Farm "entered into a special relationship with its insured to preserve the [Continental] tires," it "violated its contractual and fiduciary obligations to plaintiff by losing, destroying, disposing of and/or failing to preserve the [Continental] tires," and "[p]laintiff reasonably relied to his detriment upon [State Farm's] voluntary undertaking to preserve the [Continental] tires." Further, it is evident from the clerk's and reporter's transcripts of the demurrer, the motion for summary judgment, and the pretrial discussions, that all involved parties understood that the factual bases for plaintiff's recovery were the representation by State Farm that it would keep the tire and plaintiff's reliance thereon. These factual allegations are legally sufficient to support recovery based on promissory estoppel and/or a voluntary undertaking. (See *Toscano v. Greene Music, supra,* 124 Cal.App.4th at p. 692; *Williams v. State of California, supra,* 34 Cal.3d at p. 23.)

## IV. DISPOSITION

The judgment is reversed. Plaintiff is awarded his costs on appeal.

Gaut, Acting P. J., and Miller, J., concurred.

Respondent's petition for review by the Supreme Court was denied December 17, 2009, S177417.